UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

_____

DEAN ANDERSEN,,

            Plaintiff,

v.

HARRIS & HARRIS, LTD.,

            Defendant.

Case No.: 2:13-cv-867-PJG

_____

**BRIEF SUPPORTING CROSS MOTION FOR SUMMARY JUDGMENT AND
RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

_____

## I.      INTRODUCTION

Plaintiff does not dispute that he had an account or that he provided his cell

number to We Energies with respect to the We Energies account. Mr. Andersen spoke

with Harris & Harris Ltd. ("Harris") one time, asked Harris not to call his cell again,

and Harris honored that request. Mr. Andersen has now made good on his threats to

sue Harris if it did not pay him money, to cost Harris much in attorney fees, and he is

now asking this Court to award him over $300,000.

Plaintiff moved for summary judgment and argued that the only consideration

for this Court was whether a call was placed to his cell phone using an ATDS. As

demonstrated by Harris's affirmative defense for consent, this Court also must consider

the undisputed fact that plaintiff provided his cell number to the original creditor, We

130781111v1 0941232

Energies. Plaintiff asserts alternatively that if he did provide his number (which he did), his outgoing automatic voice message revoked consent. The TCPA is not so fickle. Consent exists as a matter of law when it is provided to the original creditor, and it cannot be revoked, let alone by a recording made by a machine, conveyed to a machine, and heard by no one.

Moreover, plaintiff does not have standing to bring the instant claims. Harris asserted in an affirmative defense that plaintiff has not incurred any injury in fact, and thus does not have standing under Article III to bring these claims. At his deposition Mr Andersen confirmed both that he was unaware of the vast majority of the calls prior to discovery, and he stipulated to the fact that he has no injury in fact. This stipulation dooms his case as it concedes he has no standing.

Finally, if this Court denies Harris's cross motion for summary judgment on the grounds that Mr. Andersen's statement that he never conveyed his cell phone number to We Energies "for the accounts at 505 Lake Street," the Court should still deny Mr. Andersen's motion for summary judgment. Initially, it does not matter that he claims not to have provided his cell with respect to specific meters – it is sufficient that he provided it to the original creditor. At a minimum, the plaintiff's impeaching criminal history and prior findings of this Court in a separate proceeding (coupled with the evidence in this case) present a question of fact as to whether he provided his cell with respect to the 505 Lake Street property.

130781111v1 0941232

## II.     BACKGROUND

As an preliminary matter, Mr. Andersen spends several pages of his brief incorrectly asserting that Harris failed to disclose We Energies as a potential witness in this case. It appears that plaintiff is attempting to preclude or forbid Harris from presenting an affidavit from We Energies. It is not proper procedurally to use summary judgment as the time to litigate discovery disputes. In any event, to put a very fine point on it, Harris identified the consent affirmative defense in its answer, produced all of We Energies account information/notes (on which Mr. Brown's affidavit relies) to the plaintiff in response to discovery and multiple lengthy disputes, and disclosed Tim Brown by name, title, and phone number at the early stages of discovery. See Exhibit 1, Email from Harris's counsel, dated January 30, 2014.

Any claim that an affidavit from Mr. Brown somehow prejudices or surprises him is absurd. Mr. Andersen has known We Energies would be a witness from the outset of this case. He has known Mr. Brown's identity and had his phone number for months. To the extent the Court considers Mr. Andersen's claims of impropriety, Harris and its counsel remain willing to expound further, but hopefully this explanation will suffice.

### A.  MR. ANDERSEN OPENS AN ACCOUNT AT WE ENERGIES.

In December 2003, Dean Andersen opened an account for revolving line of credit with We Energies, asking We Energies to provide services and agreeing to pay for those

130781111v1 0941232

services after they were provided. (Defendant's Proposed Findings of Fact [hereinafter "DPFF"] ¶ 25-26.) Mr. Andersen's account was assigned a unique identification number ending in 4455 (the "Account"). (DPFF ¶ 26.) Mr. Andersen provided all of the information to populate the personal identifiers on the Account at the time he opened the Account. (DPFF ¶ 27.) Moreover, since 2003, Mr. Andersen has (as utility customers often do) from time to time called to change his contact information or open new sources of service. (DPFF ¶ 27.)

We Energies will only change a customer's Account or contact information when requested to do so by the customer. (DPFF ¶ 28.) In order to verify that the person requesting the change is the customer, We Energies requires the customer must provide the already existing personal identification associated with the customer's account, such as account number, social security number, phone numbers, and other information. (DPFF ¶ 28.) We Energies does not change personal information associated with customers' accounts if someone merely identifying the property associated with services makes a request. (DPFF ¶ 28.)

Since opening the Account, Dean Andersen has requested services associated with eleven different meters, or sources or service, be provided to him. (DPFF ¶ 29.) In addition, Mr. Andersen has called We Energies to discuss matters related to his Account at least 45 times between July 2004 and August 2011. (DPFF ¶ 30.) We Energies' notes associated with the Account and produced in this case show that Mr. Andersen would

4

130781111v1 0941232

call in, for example, to request services be started or stopped on the Account, to inform We Energies of his various bankruptcy filings, to set up payment plans on the Account, or to speak with a manager. (DPFF ¶ 31.)

### B. THE UNDISPUTED EVIDENCE SHOWS THAT MR. ANDERSEN PROVIDED HIS CELL NUMBER TO WE ENERGIES, THE ORIGINAL CREDITOR.

Plaintiff received utility services from We Energies while he lived at the address of 505 Lake Street. (DPFF ¶ 1.) Mr. Andersen has no recollection of what year he moved into the 505 Lake Street address, and can only narrow it to sometime between 2005 and 2010[1]. (DPFF ¶ 44.) Mr. Andersen has had only one cell number, and he has had that number since 2007, prior to the time he moved to the 505 Lake Street address. (DPFF ¶ 45.)

The phone number 920-217-2839 first appears on the Account on May 7, 2008. (DPFF ¶ 32.) The notes associated with the Account on May 7, 2008, indicate that a We Energies employee called that number in response to a message left by Mr. Andersen to We Energies where Mr. Andersen left that number as his contact number to be called back. (DPFF ¶ 33.) The specific entry on the Account on May 7, 2008, states in relevant part "**I called Dean Andersen, 920-217-2839, in response to his message**. I had to leave a message & asked him to call me by 4:30 today or after 8am on 5/8. In my msg, I indicated that I reviewed our records further (after we had spoken yesterday)… ."

---

[1] We Energies account notes indicate Mr. Andersen began receiving service from We Energies at the 505 Lake Street property in late 2008.

130781111v1 0941232

(DPFF ¶ 34, emphasis added.) We Energies also called Dean Andersen at 920-217-2839 again on May 12, 2008, and that call was also requested by Mr. Andersen. The specific entry on the Account on that day indicates "**As Mr Andersen requested, I called him back at 920-217-2839** & confirmed his pymt… ." (DPFF ¶ 35, emphasis added.)

We Energies has called Dean Andersen at least three times at the phone number 920-217-2839 since May 2008. (DPFF ¶ 37.) The phone number 920-217-2839 also has been entered as an updated contact phone number associated with the Account multiple times after Mr. Andersen moved to the 505 Lake Street property. (DPFF ¶ 37.) For example, on June 18, 2009, the phone number was populated in the "Business Phone" field. (DPFF ¶ 36.) Then on April 8, 2010, the phone number was noted on the Account as a "Cell." (DPFF ¶ 37.) Finally, on June 21, 2011, the number was identified as the primary phone number. (DPFF ¶ 37.)

We Energies would not change those field designations unless specifically requested to do so by the customer. (DPFF ¶ 38.) We Energies does not obtain phone numbers from the use of skip tracing, caller identification or call capturing, or from an unauthorized third person. (DPFF ¶ 39.) The only manner in which We Energies obtains phone numbers from customers is from the customers themselves. (DPFF ¶ 40.) The last payment on the Account was July 7, 2011. (DPFF ¶ 41.)

We Energies retained Harris to collect the money Dean Andersen owes on the Account. (DPFF ¶ 42.) We Energies provided Dean Andersen's phone number, 920-

217-2839, to Harris.  (DPFF ¶ 42.)  Dean Andersen provided We Energies the phone

number 920-217-2839 in relation to debts incurred on the Account, including debts for

services at the 505 Lake Street property.  (DPFF ¶ 43.)

The evidence shows that there can be no dispute as to the fact that Mr. Andersen

provided his number to We Energies.  Although Mr. Andersen remembers that he had

multiple conversations with We Energies (DPFF ¶ 49.), he has no idea if We Energies

ever asked him for his phone number or if he ever gave them his phone number.  (DPFF

¶ 49.)  Mr. Andersen testified that he has no recollection of whether he has spoken with

anyone at We Energies since 2010.  (DPFF ¶ 49.)  Mr. Andersen theorized that his

landlord must have been the one who provided his cell number, but he has no

recollection of his landlord telling him that the landlord gave Mr. Andersen's number to

WE Energies.  (DPFF ¶ 55.)  Mr. Andersen instead hypothesizes that is what happened

because he believes "that's the only way WE Energies" could have obtained Mr.

Andersen's number.  (DPFF ¶ 55.)

C. **MR. ANDERSEN'S WAS UNAWARE OF THE VAST MAJORITY OF CALLS FOR WHICH HE NOW SUES, HARRIS HONORED THE REQUEST TO STOP CALLING HIS CELL THE ONE TIME THEY SPOKE WITH HIM, AND HE STIPULATED THAT HE HAS NO INJURY IN FACT.**

Prior to filing the lawsuit, Mr. Andersen had no idea how many times Harris

called him.  (DPFF ¶ 47.)  Mr. Andersen had one conversation with Harris, in which he

asked them not to call his cell anymore.  (DPFF ¶ 51.)  Harris honored Mr. Andersen's

request, has never called him again on his cell number, and he has never spoken to

7

anyone at Harris since that call. (DPFF ¶ 51.) Mr. Andersen stipulated that he has not incurred any actual damages and has stipulated that he has no injury in fact. (DPFF ¶ 54.)

### D. MR. ANDERSEN'S CRIMINAL AND LITIGATION HISTORY.

Mr. Andersen has been twice convicted of the crime of writing bad or worthless checks. (DPFF ¶ 52.) Mr. Andersen also has an extensive litigation background. Mr. Andersen studied law in college. (DPFF ¶ 46.) The State of Wisconsin Department of Justice told Mr. Andersen he is an expert on the Fair Debt Collection Practices Act. (DPFF ¶ 46.) Prior to filing this lawsuit, Mr. Andersen reported Harris to the Illinois State's Attorney General and the Wisconsin State Department of Financial Institutions sent letters to Harris's president threatening to file a lawsuit, and emailed Harris's counsel at least 35 times. (DPFF ¶¶ 53, 64.)

This case is procedurally similar to prior cases Mr. Andersen has pursued. In one case, he was found to have lied to the court at an evidentiary hearing. Judge William C. Griesbach explained that Mr. Andersen "obstructed counsel's efforts to conduct the discovery necessary to effectively represent her clients and seek a resolution of the case... ." (DPFF ¶ 56.) The Court went on to explain that "[w]hen offered an opportunity to present evidence in support of his allegation, Andersen offered only his own vague and unsupported testimony." (DPFF ¶ 57.)

8

130781111v1 0941232

This Court explained "[t[his court does not find Andersen's testimony credible; in fact, the court is convinced that he lied;" found Mr. Andersen "not credible;" explained that his "claim … lacks credibility;" and found that "Andersen not only lied to the Court…, he also took steps to prevent the Court and counsel from learning of his lie." (DPFF ¶ 58.) The Court described Mr. Andersen as a "modern day Uriah Heep [who used] the threat of costly litigation and sanctions under the consumer friendly provision of the FDCPA to not only avoid a business debt he legitimately owed, but has attempted to shake down the agency retained to collect it for more than ten times the amount of the debt." (DPFF ¶ 59.)

The opinion concluded by observing "[d]espite portraying himself as a poor, unrepresented victim of unlawful and oppressive debt collection practices, the record strongly suggests that Andersen has used his detailed knowledge of the intricacies of the FDCPA to avoid a legitimate debt he owed [original creditor] and to mount a counterattack on its collection agency… ." (DPFF ¶ 59.) Later in the same case, the Court reiterated its prior opinion, "concluded that [Mr. Andersen's] conduct during litigation … was obstructive and frankly demeaning to a federal tribunal," and "concluded that he lied… ." (DPFF ¶ 60.) Mr. Andersen's conduct was characterized as "with all the relish of a professional victim, it appeared that Andersen … began using the FDCPA as a 'club,' with [the debt collector] and its president as his prey." (DPFF ¶ 62.)

9

The Circuit Court for the State of Wisconsin for Waukesha County similarly found that Mr. Andersen brought claims under the FDCPA that were without merit, found that Mr. Andersen overlitigated the case at every turn, and found that Mr. Andersen made extortionate demands on the defendant. (DPFF ¶ 63.) Those findings were upheld by the Wisconsin Court of Appeals, District II, and Mr. Andersen was ordered to pay $18,125 to the debt collector defendant as a sanction for his misconduct. (DPFF ¶ 63.)

### III.    ARGUMENT

The undisputed evidence in this case shows that Harris is entitled to summary judgment. There is no question that Mr. Andersen provided his cell number to We Energies. Mr. Andersen does not dispute this fact. He instead attempts to make a distinction as to whether he provided his cell with respect to the 505 Lake Street property. The distinction is legally without consequence. Consent exists as a matter of law when a debtor provides his cell number to the original creditor, and the well-reasoned case law on this issue correctly holds that consent cannot be revoked. Even the cases that hold consent may be revoked demonstrate that Mr. Andersen did not effectively revoke consent. His use of an outgoing automated voice mail to deliver a message to a machine is not sufficient, especially given the premise that he consented to being called by the machine. Finally, Mr. Andersen has demonstrated and stipulated that he has no injury in fact, and thus lacks legal standing to bring the instant claims.

10

**A.** **MR. ANDERSEN PROVIDED HIS CELL NUMBER TO WE ENERGIES, ESTABLISHING CONSENT AS A MATTER OF LAW TO BE CALLED ON HIS CELL PHONE.**

The undisputed evidence shows that Mr. Andersen provided his cell number to We Energies, the original creditor. Mr. Andersen recalls very little about the conversations he has had with We Energies, other than to testify that he knows has had multiple conversations. He does not know if We Energies ever asked him for his phone number, or whether he ever provided it. He does not recall if there have been any conversations since 2010. He does not know when he moved to and started receiving service at 505 Lake Street. Notwithstanding his lack of memory, he coyly claims in his affidavit to be certain that he "never conveyed [his] cell phone number to We Energies **for the accounts of 505 Lake Street**… ." Plaintiff's Memo, Docket Entry 43, Exhibit 1, ¶ 4 (emphasis added). This statement is insufficient to dispute that he gave prior express consent.

Harris has presented undisputed evidence that Mr. Andersen provided his number to We Energies in May 2008 and asked We Energies to call him back at that number. We Energies business records show both the content of the message, detailing the phone number, as well as the fact that a return call was made and Mr. Andersen and that We Energies spoke with him. Harris has produced evidence that We Energies changed the identifying information on Mr. Andersen's Account on three separate

11

130781111v1 0941232

occasions to update Mr. Andersen's cell number as his contact between June 2009 and June 2001. We Energies has explained that the only manner in which those changes would be made is by Mr. Andersen's request after confirming that Mr. Andersen was the one on the phone. Mr Andersen, by his own admission, has no recollection sufficient to dispute this evidence. He has no specific recollection of any calls, does not know if he has spoken to We Energies since 2010, and cannot recall if We Energies asked or if he provided his phone number. There can be no reasonable doubt given the evidence presented that Mr. Andersen provided his cell number to We Energies. The only even arguable question of fact is how many times he provided it.

The TCPA prohibits calls to a cell phone only if they are made without the called party's consent. Section 227(b)(1) makes it unlawful for a person:

> (A) to make any call (**other than a call made for emergency purposes or made with the prior express consent of the called party**) using any automatic telephone dialing system or an artificial or prerecorded voice—
> …
> (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call; 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added).

The prohibition in the TCPA does not apply if the called party consented to receive auto-dialed and/or prerecorded message calls on his cell phone. The FCC has clarified what constitutes "express consent" under the statute pursuant to its authority

130781111v1 0941232

to create rules and regulations implementing the TCPA. *See* 47 U.S.C. § 227(b)(2). The

FCC issued a declaratory order which states that:

> Because we find that autodialed and prerecorded message **calls to wireless numbers provided by the called party in connection with an existing debt are made with the "prior express consent"** of the called party, we clarify that such calls are permissible. We conclude that the provision of a cell phone number to a creditor, e.g., as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt.
>
> Calls placed by a third party collector on behalf of that creditor [to whom prior express consent was provided] are treated as if the creditor itself placed the call.

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* FCC Declaratory Ruling No. 07-232, 23 FCC Rcd. 559 ¶ 9-10 (emphasis added).

Under these regulations, when a debtor provides his cell phone number to a

creditor, the debtor consents to receive auto-dialed and prerecorded message calls on

his cell phone, and the creditor's debt collector may call the cell phone number using an

ATDS or prerecorded message without violating the TCPA. It is undisputed that Mr.

Andersen provided his number to We Energies, who, in turn, provided the cellular

phone number to Harris. Courts have universally held that the provision of debtor's

cell phone number means as a matter of law that the debtor consented to receive auto-

dialed calls from a debt collector. *Saunders v. NCO Fin. Sys.*, 910 F.Supp.2d 464

(E.D.N.Y. 2012) (citing numerous cases for the proposition that the "voluntary

furnishing of a cellphone number to a vendor or other contractual counterparty

130781111v1 0941232

constitutes expressed consent"); *Wills v. Optimum Outcomes, Inc.*, 2014 WL 220707 (D.Utah January 21, 2014) (holding that "when a debtor provides his cellular number to a creditor, that debtor provides express consent to receive auto-dialed or prerecorded message calls on that cellular phone from both the creditor and the creditor's third-party debt collector").[2]

The FCC has held that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have been given . . ." *In the Matter of Rules & Regulation Implementing the Telephone Consumer Protection Act of 1991*, 7 F.C.C.R. 8752, 8769 (Oct. 16, 1992). The FCC later clarified that "autodialed and prerecorded message calls to wireless numbers provided by the called party in connection with an existing debt are made with the 'prior express consent' of the called party." *In the Matter of Rules & Regulation Implementing the Telephone Consumer Protection Act of 1991*, 23 F.C.C.R. 559, 564 (Jan. 4, 2008). "Therefore, a party does not violate the TCPA by calling a number which was provided as one the

---

[2] See also *Pinkard v. Wal-Mart Stores, Inc.*, 2012 WL 5511039 (N.D. Ala. Nov. 9, 2012) (dismissing plaintiff's TCPA claim because there was consent); *Mitchem v. Ill. Collection Serv.*, 2012 WL 170968 (N.D. Ill. Jan. 20, 2012) (consent given to the hospital to call plaintiff's cell phone, so defendant debt collector did not violate the TCPA). "Prior express consent" to be contacted on a cell phone via an ATDS in regards to a particular debt has been deemed granted in situations where a plaintiff provided his or her cell phone number to a creditor during the transaction that resulted in that particular debt. *See, e.g., Castro v. Green Tree Servicing LLC,* 959 F.Supp.2d 698 (S.D.N.Y. Aug. 14, 2013); *Saunders v. NCO Fin. Sys.*, 910 F.Supp.2d 464, 467 (E.D.N.Y.2012); *Adamcik v. Credit Control Servs., Inc.*, 832 F.Supp.2d 744, 748 (W.D.Tex.2011) ("[T]he evidence at trial conclusively showed [plaintiff] provided her cellular telephone number to [creditor] … [and the] FCC has ruled this constitutes prior express consent under § 227(b) to receive autodialer calls related to debt collection.");

14

130781111v1 0941232

called party wishes to be reached." *Nigro v. Mercantile Adjustment Bureau, LLC*, 2013 WL 951497, at *3 (W.D.N.Y. March 12, 2013).

That is exactly what happened here – Harris called plaintiff at the number he told We Energies was the number where he would like to be reached. He first told We Energies that in May 2008 when he left voice messages asking We Energies to return his call at that number, and then routinely updated his We Energies Account to identify his cell number as the number on which he would like to be reached.

The distinction that Mr. Andersen appears to be making – that he did not provide his cell number with respect to the 505 Lake property – is factually unsupportable given the wealth of evidence, phone calls, and notes provided by We Energies. He has not (and cannot) reasonably dispute that he provided it numerous times with respect to the 505 Property. In any event, the distinction is without legal consequence. It is undisputed that he provided his cell number to We Energies, and that is the only consideration for purposes of consent on summary judgment.

**B.  CONSENT IS IRREVOCABLE AS A MATTER OF LAW AND, IN ANY EVENT, WAS NOT PROPERLY REVOKED BY LEAVING AN OUTGOING VOICE MESSAGE TO AN UNATTENDED PHONE CALL.**

Mr. Andersen argues that if this Court determines he provided consent, his outgoing voice message had the legal effect of revoking the consent he provided as a matter of law. The argument that Mr. Andersen revoked consent based upon a recorded message (his outgoing voice mail) that was at best delivered to a machine (the

130781111v1 0941232

ATDS sending him a message) fails on its face. The nature of the consent defense is that by providing his cell number, he consented to receive automated, unattended phone calls. Plaintiff would have this Court believe that the TCPA imposes a burden on Harris (and all debt collectors) to monitor the outgoing messages of the previously consenting consumer's automated voice messages to determine whether they revoke their consent to receive automated calls. It plainly does not. That position disregards the whole concept of consenting to receive automated calls with prerecorded messages – they are by their nature calls without human intervention.

The TCPA does not provide a debtor a substantive right to revoke his consent. *Saunders*, 910 F.Supp.2d at 468-69 (E.D.N.Y. 2012); *Chavez v. The Advantage Group*, 2013 WL 4011006, *4 (D.Colo. Aug. 5, 2013). *Saunders* held that:

> It is not as if we are dealing with a fundamental constitutional right where a waiver may, under limited circumstances, be withdrawn. [citation omitted] This is a narrow statutory right not to receive automated calls on a cellphone. A consumer that voluntarily gives it up need not have an opportunity to change his mind later; he has withdrawn from the protection of the statute. He is no worse off than all other consumers were before the passage of the statute, because he has opted out of the statute. Nor is there anything unduly harsh about this conclusion; the consumer, if he is a debtor, remains protected from harassment by the FDCPA.

*Saunders*, 910 F.Supp.2d at 469. Although there is a line of cases like those on which Mr. Andersen relies holding that in narrow instances a debtor can revoke consent (either holding that revocation must be in writing or holding oral revocation sufficient), *Saunders* respectfully, but soundly, rejected both lines of cases:

16

130781111v1 0941232

> The reason there is a split among these authorities [as to whether revocation must be in writing or not] is because the statute provides for neither result, so those courts that wish to permit withdrawal of consent are forced to apply their own policy preferences. If Congress wishes to change the statute, it can—it has shown in the FDCPA that it knows how to provide withdrawal of consent when it wants to—but I do not think it is for the courts to read a substantive right into a statute when it is quite conspicuously missing.

*Id*. *Chavez* found the *Saunders* interpretation of the TCPA articulate and eloquent. *Chavez*, 2013 WL 4011006, at *3. Following *Saunders*, *Chavez* agreed that there is no right to revoke consent under the TCPA, so such a right cannot be read into the act. *Id*. at *3-4. As a result, Mr. Andersen's argument that he has a right to revoke his consent under the TCPA should be rejected because nothing in the TCPA provides for such a right.

Even if the Court decides that a right to revoke consent exists, the standard to revoke consent cannot be less than the written requirement required by the FDCPA. *Kenny v. Mercantile Adjustment Bureau, LLC*, 2013 WL 1855782 (W.D.N.Y. May 1, 2013) (the FDCPA's written notice requirements to halt the debt collection calls governs revocation of consent under the TCPA). Even if there is a right to revoke consent under the TCPA, at a minimum, Mr. Andersen must do so in writing.

None of the cases on which Mr. Andersen relies support a finding that a debtor who consented to receiving automated, unattended calls using prerecorded messages may revoke consent by setting an automated response. The absurdity of the assertion is evidence by the content of Mr. Andersen's message, which purports to limit the previously granted authorization by explaining, "If you are not an automated call or

17

130781111v1 0941232

automated recording, please leave a message." It is unclear how Mr. Andersen expects an automated call or automated recording to abide by his request.

To support his position, Mr. Andersen incorrectly asserts that "[a]t least one court has found that placing intermittent live calls is necessary to accomplish" verification that it still has consent. Pltf's Brief, DE 43, p. 24. Harris is not aware of any such holding, and the case to which Mr. Andersen refers does not so hold. *See Breslow v. Wells Fargo Bank, N.A.*, 857 F.Supp.2d 1316 (S.D.Fla. 2012). The *Breslow* case considered who was a "called party" under the TCPA in light of the fact that the defendant intended to call someone other than the recipient of the calls. The court there was examining whether the "called party" was the person listed on the defendant's account records, and the person who provided the phone number, in light of the modern reality that phone numbers migrate. The court analyzed the situation and in dicta explained that:

> If a "called party" with respect to § 227(b)(1)(A)(iii) is the intended recipient, the moral of the story is that consumers who acquire new cellular phone numbers and wish to avoid unwanted calls bear the responsibility of determining whether or not a prior owner of the number ever gave consent to any lending institutions to be called. If the "called party" is the actual recipient, the moral is that companies who make automated calls bear the responsibility of regularly checking the accuracy of their account records or placing intermittent live verification calls.

*Id*. at 1322. Mr. Andersen takes a selective portion of the quote above and misstates it for the proposition that the court held the defendant must place intermittent calls to check that consent has not been revoked. It plainly did not so hold.

130781111v1 0941232

C.    MR. ANDERSEN LACKS STANDING BECAUSE HE HAS NO INJURY IN FACT.

Article III of the United States Constitution limits the exercise of federal judicial power to deciding "cases" or "controversies."  U.S. Const., Art. III, § 2.  "[T]he most important" way that this limitation is enforced is the requirement that a litigant have "standing" to invoke that judicial power.  *Allen v. Wright*, 468 U.S. 737, 750 (1984) (internal quotation marks omitted).  The elements of Article III standing are "familiar," and include the requirement that a plaintiff sustain "personal injury."  *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (further citation omitted).  The personal injury element of standing requires a plaintiff to allege and prove an "injury in fact," that is, "a harm that is both 'concrete' and 'actual or imminent, not conjectural or hypothetical.'"  *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000), *quoting Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).  Article III standing also requires causation and damages.  *Lujan v. Defenders of Wildlife*, 504 U.S. 55 (1992); *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998); *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).

Mr. Andersen does not seek and did not sustain a personal injury or injury-in-fact in this lawsuit.  He has presented no evidence of any personal injury, and to the contrary, at his deposition he stipulated that he has incurred no injury in fact.   Plaintiff seeks solely statutory damages.  Complaint, DE 1.  Mr. Andersen acknowledged as his deposition that he had no idea how many calls were even placed to him, so there is

19

130781111v1 0941232

simply no plausible avenue by which he standing to recover for any calls not alleged in the complaint. Mr. Andersen does not have standing to continue to ask this Court to exercise judicial power to his benefit. Because Article III is a constitutional limit on jurisdiction, its requirements are not met merely because a statute provides plaintiff a cause of action. *See Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997); *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 n.24 (1982).

The fact that the TCPA authorizes awards of "statutory damages" independent of whether a plaintiff has claimed actual injury similarly does not suspend the constitutional standing requirement. No statute can confer standing on a plaintiff in the absence of actual harm, which Mr. Andersen acknowledges he does not have. "[T]he requirement of injury in fact is a hard floor of Article III jurisdiction" that "cannot be removed by statute." *Summers*, 555 U.S. at 497. It is a "core component" of a plaintiff's standing that is "derived directly from the Constitution," *Allen*, 468 U.S. at 751, and represents an "irreducible constitutional minimum of standing," *Lujan*, 504 U.S. at 560 (1992). It is thus "settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Raines*, 521 U.S. at 820 n. 3. And the requirement of injury in fact applies not only to cases brought under statutes allowing generalized "citizen suits" (see, e.g., *Lujan*, 504 U.S. at 571-73). The injury requirement also applies to cases, like those brought under the TCPA, in which the statute at issue provides for recovery of an

20

130781111v1 0941232

individual's losses (*see Sprint Commc'n Co. v. APCC Serv., Inc.*, 554 U.S. 269, 273-74 (2008) (plaintiffs suing under federal telecommunications statute were assigned causes of action by statute but still had to establish Article III standing); *Gollust v. Mendell*, 501 U.S. 115, 126 (1991).

Finally, Mr. Andersen cannot claim that his financial stake in the recovery of "statutory damages" conferred standing upon him. That argument was rejected in *Vermont Agency*, wherein the Court held that a plaintiff's interest in a recovery of money, without more, cannot confer standing even though it represents a "'concrete private interest'" in the case. 529 U.S. at 772 (*quoting Lujan*, 504 U.S. at 573). A plaintiff's interest in such a windfall could not satisfy Article III because it was no more than a "bounty" that was "unrelated to injury in fact." *Vermont Agency*, 529 U.S. at 772. Here, Mr. Andersen has stipulated that he does not have standing under Article III of the Constitution, he has presented no evidence of an injury in fact, and this Court thus has no jurisdiction over his claims.

**D.      THERE IS SUFFICIENT EVIDENCE IN THE RECORD TO REQUIRE PLAINTIFF TO PRESENT HIS EVIDENCE TO A TRIER OF FACT.**

Finally, Mr. Andersen's motion for summary judgment must be denied (or the relief sought modified) for additional reasons. Initially, the motion seeks to recover for a disputed number of calls, which in the event of a finding of liability, this Court cannot resolve that dispute. As explained Section III(c) above, Harris asserts that Mr. Andersen cannot possibly assert claims for calls not included in his complaint. To the extent he is

130781111v1 0941232

allowed to rely on Harris's records to support the total number of calls, he must accurately convey what those records show.

More importantly, Mr. Andersen's motion should be denied for two additional reasons. First, to the extent this Court determines that it is material that Mr. Andersen must have provided his number to We Energies with respect to the 505 Lake Street property, and if this Court holds that there is a dispute with respect to that fact, then that fact is disputed by We Energies account information. There is ample evidence that Mr. Andersen is not credible, including two impeaching convictions for crimes involving dishonestly and numerous findings in this Court and Wisconsin state court that Mr. Andersen lied.

Most importantly, Mr. Andersen's motion seeks an injunction enjoining Harris's conduct. It is not clear from the motion exactly what this injunction seeks except to enjoin Harris's conduct. Harris asserted two equitable affirmative defenses to plaintiff's equitable claims – unclean hands and equitable estoppel. Those claims assert that plaintiff manufactured these claims by providing his number to the original creditor, indicated that he wished to be called at that number, and that Harris relied upon those assertions to its detriment. They also assert that to the extent Mr. Andersen's seeks equity, he must act equitably.

There is sufficient evidence in the record that Mr. Andersen manufactured these claims with an intent to harass Harris, and that he exhibited conduct strikingly similar

130781111v1 0941232

to that for which he was sanctioned in this Court and Wisconsin state court. That conduct includes extortionate demands, unreasonably overlitigating the case at every turn including prior to filing the lawsuit, reporting Harris to state agencies in an effort to harass Harris, and using his knowledge of the consumer laws as a club with the debt collector and its president as his prey. Harris should be permitted to present this evidence, including the thirty-five emails (of the fifty total emails) Mr. Andersen sent Harris and its counsel prior to the filing of this lawsuit. This evidence shows his true intention, and he should not be permitted to pursue equitable claims under the circumstances.

Finally, in the event this Court determines there was a violation, the Court should not exercise its discretion in awarding treble damages for all of the foregoing reasons. The facts of this case do not rise to the level of a wilful violation, and it is illogical to assert that because Harris was aware of and tried to comply with the TCPA, it is evidence that the violation was wilful.

## IV.   CONCLUSION

The facts in this case are simple, straightforward, and undisputed. Mr. Andersen provided his cell number to We Energies, who in turn provided it to Harris. Harris called Mr. Andersen to collect a debt he owes We Energies. The only time that Harris and Mr. Andersen spoke, he requested Harris no longer call his cell number. Harris

130781111v1 0941232

honored the request, and Mr. Andersen sued Harris for over $300,000. For all the foregoing reasons, Mr. Andersen's claims fail, and Harris is entitled to judgment.

Dated at Chicago, Illinois this 1st day of April 2013.

/s/ Justin M. Penn
Justin M. Penn
Illinois State Bar No. 6283726

Attorneys for Defendant, HARRIS & HARRIS, LTD.

**HINSHAW & CULBERTSON LLP**
222 N. LaSalle, Suite 300
Chicago, IL 60601
Phone No. 312-704-3157
Fax No. 312-704-3001
E-mail Address(es):
jpenn@hinshawlaw.com

24

130781111v1 0941232

## CERTIFICATE OF SERVICE

I, an attorney, hereby certify that on April 1, 2014, I electronically filed Defendant's Brief Supporting Cross Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/Justin M. Penn
Justin M. Penn

25

130781111v1 0941232