# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DEAN A. ANDERSEN,

                    Plaintiff,

v.                                                      Case No. 13-CV-867-JPS

HARRIS & HARRIS, LTD.,

                    Defendant.                          ORDER

The plaintiff, Dean Andersen, initiated this suit on July 30, 2013. (Docket #1). He alleges that the defendant, Harris & Harris, Ltd. ("H&H"), violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227, *et seq.*, by using an automated telephone dialing system to place collections calls to him. (Docket #1, ¶¶ 26–38). The parties filed cross-motions for summary judgment, under a modified briefing schedule. (Docket #41, #42, #50). The parties have fully briefed those motions (Docket #43, #48, #54, #56), and the Court has received ample briefing on Mr. Harris' recently-filed motion to strike (Docket #50, #53, #54, #56). The Court thus turns to resolve the motions, first recounting the pertinent facts, then resolving the motion to strike before addressing the parties' cross-motions for summary judgment.

## 1.    BACKGROUND

Before beginning its discussion of the factual background of this case, the Court must first discuss Mr. Andersen's serious failures to follow the Eastern District's Civil Local Rules.

### 1.1    Mr. Andersen's Failure to Abide by Civil Local Rules

> *And why beholdest thou the mote that is in the brother's eye, but considerest not the beam that is in thine own eye? Or how wilt thou say to thy brother, Let me pull out the mote of thine eye; and, behold, a beam is in thine own eye?*
>
> —Matthew 7:3–7:4 (King James)

The Court begins its discussion with a primer on the Civil Local Rules of the Eastern District of Wisconsin. Civil Local Rule 56 governs submissions of summary judgment materials. Under Civil Local Rule 56, movants must file "a statement of proposed material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." Civil L.R. 56(b)(1)(C). Failure to submit that statement "constitutes grounds for denial of the motion." Civil L.R. 56(b)(1)(C)(iii). The nonmovant must then file a response to the movant's statement of proposed facts, either admitting or denying each proposed fact, and listing any additional proposed facts that might require the denial of summary judgment. Civil L.R. 56(b)(2)(B)(i–ii). Finally, the movant must reply to any additional facts submitted by the nonmovant, either admitting or denying those facts. Civil L.R. 56(b)(3)(B). Our local rules are very clear: "The Court will deem uncontroverted statements of material fact admitted solely for the purpose of deciding summary judgment." Civil L.R. 56(b)(4).

Mr. Andersen, through counsel, has not followed *any* of those rules.[1] He barely remembered to file the statement of fact required of him as a movant for summary judgment under Civil L.R. 56(b)(1)(C). (*See* Docket #45,

---

[1]This is particularly ironic in light of Mr. Andersen's earlier attempt to treat H&H's late discovery responses as admitted, in spite of H&H's timely request for an extension, which Mr. Andersen refused to accommodate. (*See* Docket #19, #27). To be sure, H&H's request for an extension *did* come later than it should have. But, at the discovery stage, late responses occasionally occur, and the Court rarely, if ever, has to get involved. The summary judgment stage, on the other hand, is higher-stakes: it is the first time the parties are put to their proof. So, it is particularly ironic that Mr. Andersen wanted a very minimal error on H&H's behalf in discovery (compounded, in no small part by Mr. Andersen's own poor communication) to be dispositive in this case, while failing to even acknowledge his own substantial failures in following the important rules governing summary judgment.

Case 2:13-cv-00867-JPS   Filed 04/21/14   Page 2 of 22   Document 57

#46). In fact, it was only because H&H's counsel advised Mr. Andersen's counsel of his failure to submit proposed findings of fact that Mr. Andersen's counsel did so. (*See* Docket #56, at 1–2). And then, because that submission was untimely, he relied on the Court's granting his motion to file that submission late. (Docket #45). Had H&H's counsel not been quite so upstanding, instead allowing the non-submission to stand, then the Court would have been within its discretion to deny Mr. Andersen's motion for summary judgment outright pursuant to Civil L.R. 56(b)(1)(C)(iii).

Equally troubling is Mr. Andersen's later failure to file responses to H&H's proposed additional facts. The Court realizes that this proceeding may appear somewhat confusing, because of the modified briefing schedule (Docket #41), but that is not an excuse for the total failure to file responses to an opposing party's statements of fact. Under either Civil L.R. 56(b)(2)(B) and Civil L.R. 56(b)(3)(B), Mr. Andersen had the obligation to respond to H&H's additional proposed facts, and potentially to raise any new proposed material facts that he believed should persuade the Court to deny H&H's separate motion for summary judgment (Docket #50). That is because Mr. Andersen was acting as both movant and nonmovant at the time he filed his second brief: his second brief was, in effect, both a reply brief in favor of his motion for summary judgment and a response brief in opposition to H&H's motion for summary judgment. (Docket #41). If nothing else, Mr. Andersen should have filed responses to H&H's additional proposed findings. Without those responses, the Court lacks a firm grasp of the basis for any factual disputes that Mr. Andersen may rely on in his second brief. Likewise, his failure to file responses makes it very difficult for H&H to address any factual disputes in its reply brief—because H&H did not receive full or formal notice of those factual disputes from Mr. Andersen, its ability to

respond to or explain the importance of those disputes was substantially diminished.

This District has adopted its Civil Local Rules for a reason. It views them as best practices, designed to ensure that the parties and the Court best understand the facts and arguments in each case. Violation of the Civil Local Rules—particularly when the violation involves submissions to the Court—are serious, because the violation seriously diminishes the abilities of the parties and the Court to understand the totality of the situation before it.

Thus, the Court predominantly agrees with H&H: it must deem H&H's additional proposed facts as admitted, as a result of Mr. Andersen's failure to respond to them, and pursuant to Civil L.R. 56(b)(4). This is especially true in light of the fact that Civil L.R. 56(b)(4) states that the "Court *will* deem uncontroverted statements of material fact admitted solely for the purpose of deciding summary judgment" (emphasis added). Moreover, the Seventh Circuit has routinely noted the importance of allowing district courts to enforce their local rules: "'Because of the important function local rules like [the Northern District of Illinois' local rule on summary judgment] serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules.'" *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (quoting *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005); also citing *Koszola v. Bd. of Educ.*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (collecting cases)). To be sure, Mr. Andersen has raised some potentially-valid objections to the evidence on which H&H based a number of its additional proposed facts. The Court will address those objections because it is not fully comfortable

treating facts as admitted if those facts are based upon inappropriate or inadmissible evidence. Nonetheless, the Court will otherwise treat H&H's additional proposed facts as admitted, particularly in recounting this factual background. The Court will address the evidentiary objections more fully in a separate section below.

### 1.2    Factual Background

Mr. Andersen opened an account with WE Energies in December of 2003. (DPFF ¶ 26). In connection with that account, he received utility services at eleven separate meters (DPFF ¶ 29; PPFF ¶ 1) and agreed to pay for those services (DPFF ¶ 26).[2]

Of course, when Mr. Andersen opened his account, he had to provide personal information, including contact information, such as his cell phone number. (DPFF ¶ 27). WE Energies' records reflect that Mr. Andersen called twice in the month of May, requesting that WE Energies employees call him back on his cell phone number—(920) 217-2839, which the Court will refer to as Mr. Andersen's "cell phone number" for the balance of this opinion, because it is the number at which Mr. Andersen received the allegedly-illegal calls in question. (DPFF ¶¶ 34–35). Shortly thereafter, Mr. Andersen called to change his contact information: he added his cell phone number as his "Business Phone," later changing it to his "Cell," and finally his primary phone number in WE Energies' account records. (*See* DPFF ¶¶ 27–28, 32, 37).

---

[2]The Court will refer to Mr. Andersen's proposed findings as "PPFF," and H&H's proposed findings as "DPFF."

WE Energies would not have changed that information unless Mr. Andersen specifically requested that they do so.[3]

Mr. Andersen resided at 505 Lake Street, in Waukesha, Wisconsin, and received utility service from WE Energies at that location. (PPFF, ¶ 1). He apparently has no recollection of the year that he moved to that address, but he has used his cell phone number since 2007, prior to the time he moved to that address. (DPFF ¶¶ 44–45). He eventually was evicted from 505 Lake Street, and therefore stopped receiving services at that address. (DPFF ¶ 50).

He later stopped paying his account entirely, on July 7, 2011. (DPFF ¶ 41). At that time, WE Energies hired H&H to collect Mr. Andersen's debt. (DPFF ¶ 42). In connection with that collection, WE Energies provided H&H with the primary phone number listed on Mr. Andersen's account: his cell phone number, (920) 217-2839. (DPFF ¶ 42).

H&H started collections calls to that phone number in October of 2011. (PPFF ¶ 2). It primarily used a TouchStar dialing system, which automatically calls phone numbers and then leaves artificial, prerecorded

---

[3]Pursuant to WE Energies' business practices, WE Energies cannot change a customer's contact information unless the customer requests so. (See DPFF ¶¶ 28, 38). In fact, before allowing a customer to change any contact information, WE Energies first requires that the customer provide personally identifying information, such as an account number, social security number, phone number, or other information associated with the account. (DPFF ¶¶ 28, 38). WE Energies does not use skip tracing, caller ID, or other methods for obtaining phone number information from customers or third parties—rather, it obtains phone numbers only from the customers themselves. (DPFF ¶¶ 39–40). Mr. Andersen asserts that he believes that his landlord gave his number to WE Energies (DPFF ¶ 55), but this would not be consistent with WE Energies' business practices nor is it supported in *any way* by *any evidence*. Like so much of Mr. Andersen's testimony, it is vague, self-serving, unsupported, and totally reliant on supposition. Frankly, for a person who cannot remember his correspondence with WE Energies (DPFF ¶ 49) and—more incredibly—the approximate date of his move to a new residence (DPFF ¶ 45), he makes quite a request in asking anyone to trust such speculation.

Case 2:13-cv-00867-JPS   Filed 04/21/14   Page 6 of 22   Document 57

voicemail messages. (PPFF ¶¶ 3, 6–7, 14). During this time, Mr. Andersen's outgoing voicemail greeting message stated:

> any and all automated calls and automated voicemail messages to this cell phone are strictly forbidden and any and all consent under 47 U.S.C. section 227 has been and is hereby revoked. If you are not an automated call or automated recording, please leave a message and someone will get back to you shortly.

(PPFF ¶ 13). Of course, because H&H was using a dialer system, it never received that message, and so continued to call Mr. Andersen's cell phone number. In the end, it called Mr. Andersen's cell phone number approximately 163 times. (*See* PPFF ¶ 3, and Def.'s Resp.). Finally, a live agent reached Mr. Andersen, at which time Mr. Andersen requested that H&H stop calling his cell phone number. (DPFF ¶ 51). H&H immediately complied and stopped its calls. (DPFF ¶ 51).

Mr. Harris then filed the immediate suit, alleging that H&H's automated calls violated the TCPA. (Docket #1).

2.    MOTION TO STRIKE

Before reaching the merits of the parties' cross-motions for summary judgment, the Court must first address Mr. Andersen's motion to strike (Docket #50). Mr. Andersen requests that the Court strike the affidavit of Tim Brown (the "Brown Affidavit"; Docket #47, Ex. A), which sets forth certain information about WE Energies' calls to Mr. Andersen, the information associated with Mr. Andersen's account, and WE Energies' business practices. (Docket #53, at 3–9). Mr. Andersen also requests that the Court strike Exhibits C, D, E, and F to Docket #47; all of those exhibits pertain to other suits and activities that Mr. Andersen has engaged in, often in regards to the TCPA. (Docket #53, at 9–12). The Court will address these two sets of documents separately.

### 2.1 Brown Affidavit (Exhibit A)

The Court turns first to the Brown Affidavit. Mr. Andersen makes various arguments as to why the affidavit should be inadmissible: that it is not based upon personal knowledge (Docket #53, at 4–6); and that it constitutes inadmissible hearsay and violates the best evidence rule (Docket #53, at 6–8).[4] Both of those arguments fail, and the Court finds that the Brown Affidavit is admissible.

As to personal knowledge, the Brown Affidavit lays a proper foundation. Tim Brown states that he is employed as Operations Manager of Credit and Collections for WE Energies (Docket #47, Ex. 1, ¶ 2), and understands and regularly uses WE Energies' record-keeping system (Docket #47, Ex. 1, ¶ 4). He then provides a statement about the information contained in Mr. Andersen's account and WE Energies' business practices. (*See* remainder of Docket #47, Ex. 1). Given Mr. Brown's employment as the manager of the collections department at WE Energies, the Court finds that he has ample reason to understand both WE Energies' records and its business practices. For that reason, it is satisfied that he has personal knowledge sufficient to make the affidavit in question.

That conclusion is further buttressed in two separate ways. First, the Court agrees with H&H that Mr. Brown, acting as WE Energies' corporate representative, was permitted to verify WE Energies' records and practices by virtue of his personal knowledge of and familiarity with WE Energies' records. (Docket #56, at 4–5 (citing *ABN Amro Mortgage Group, Inc. v.*

---

[4]Mr. Andersen also previously accused H&H of not identifying WE Energies-related evidence in discovery. (Docket #43 at 17–19). That allegation was apparently totally unfounded (*see* Docket #56 at 2), and Mr. Andersen has not posited it any further.

Case 2:13-cv-00867-JPS   Filed 04/21/14   Page 8 of 22   Document 57

*Maximum Mortgage, Inc.*, 2006 WL 2598034, *5 (N.D. Ind. Sept. 8, 2006); *Westchester Fire Ins. Co. v. American Wood Fibers, Inc.*, 2006 U.S. Dist. LEXIS 24225 at *12, 2006 WL 752584 (N.D. Ind. March 21, 2006)). Second, the records in question—to the extent that Mr. Andersen challenges the Brown Affidavit as improperly relying upon them—were not required to be submitted in full. *See* Fed. R. Ev. 901(a), 1006. Rather, because H&H made the records available to Mr. Andersen as part of discovery and they are still available for examination, H&H was permitted to present them in the form of a summary, Fed. R. Ev. 1006, which it did through the Brown Affidavit.

As to whether the Brown Affidavit contains inadmissible hearsay, the Court concludes it does not. Generally, very little of the alleged hearsay is offered for the truth of the matter asserted. To the extent that Mr. Brown provided information from records about calls to or from Mr. Andersen (*see* Docket #74, Ex. 1, ¶¶ 6, 8–11, 15–16), H&H now offers that evidence to show that Mr. Andersen changed his phone number in WE Energies' system, rather than to show that WE Energies *actually* called Mr. Andersen. Some small portion of the Brown Affidavit may include hearsay, for example where Mr. Brown relays comments from phone operators (Docket #47, Ex. 1, ¶¶ 12–14), but the Court can excise those portions of the affidavit and the *material* facts attested to remain exactly the same: at some point, WE Energies began calling Mr. Andersen on his cell phone number and later changed that number in the system. From Mr. Brown's statements based on personal knowledge (*e.g.* Docket #47, Ex. 1, ¶¶ 16, 17, 18), which are not hearsay, the Court also knows that WE Energies would not use that number without receiving it from Mr. Andersen. As such—even ignoring the potentially-inadmissible hearsay—the Brown Affidavit largely remains intact. Certainly, its key points on issues of material fact still stand.

Case 2:13-cv-00867-JPS   Filed 04/21/14   Page 9 of 22   Document 57

Finally, the Court agrees with H&H that there is no best evidence rule violation, seeing as the Brown Affidavit summarizes accurate business records. (Docket #56, at 5–6 (citing *Peter Kiewit Sons' Co. v. Summit Const. Co.*, 422 F.2d 242, 267 (C.A.S.D. 1969) ("neither the business records exception to the hearsay rule, nor the best evidence rule are violated by the presentation of summaries of properly kept business records which if offered into evidence would themselves be admissible"))). Moreover, to the extent that there is any violation, it is not a serious one: the entire business records are available (and, in fact, in Mr. Andersen's possession). H&H could have submitted—and still could submit—those records, but instead chose to rely on the Brown Affidavit as a summary. There is no serious challenge to the accuracy of the business records or to the Brown Affidavit's summary of them—rather, Mr. Andersen makes only the technical argument that the records should have been submitted instead of the summary. The Court does not find that ample reason to strike the affidavit under the best evidence rule.

For all of these reasons, the Court will deny Mr. Andersen's motion to strike as to the Brown Affidavit, except insofar as it strikes Paragraphs 12 through 14 of the Affidavit as inadmissible hearsay. However, as the Court earlier observed, the stricken paragraphs do not change the Court's analysis.

### 2.2 Evidence of Mr. Andersen's Other Suits and Activities (Exhibits C, D, E, and F)

On the other hand, the Court must strike Exhibits C, D, and E, pertaining to various other activities and suits in which Mr. Andersen has been involved. Specifically, Exhibits C and D are orders from *Andersen v. Baxter*, E.D. Wis. Case No. 07-CV-313-WCG, in which Judge William Griesbach criticizes Mr. Andersen's course of action throughout a Fair Debt Collection Practices Act ("FDCPA") case. Exhibit E is a Wisconsin Court of

Appeals decision in Case No. 2012AP104, affirming the Wisconsin Circuit Court's award of attorney's fees against Mr. Andersen for abusive practices. The Court cannot envision any way in which these documents are relevant to a fact of consequence: Mr. Andersen's past conduct does not make his allegations in this case any more or less likely to have occurred. Perhaps it goes to his credibility, but at this stage of the proceedings the Court would prefer not to consider the documents for that reason, simply because there are ample facts and reasons—without resorting to credibility determinations—on which this case ought to be dismissed.[5] The Court will, therefore, strike Exhibits C, D, and E.

Exhibit F is, however, not unduly prejudicial; the Court will still strike Exhibit F as both irrelevant and a violation of Federal Rule of Evidence 408. Exhibit F is a collection of emails sent by Mr. Andersen to H&H demanding settlement for alleged TCPA, FDCPA, and Wisconsin Consumer Act violations, all based upon the calls giving rise to this case. Federal Rule of Evidence 408 make settlement negotiations documents inadmissible, except when certain exceptions are met. Simply put, the emails have absolutely no relevance to any fact of consequence in this case, and so would not be admissible even if one of Federal Rule of Evidence 408's exceptions were met. The Court, therefore, will likewise strike Exhibit F.

---

[5] If it were necessary to go to trial, the Court may reconsider this ruling before allowing Mr. Andersen to testify. That is, it may be appropriate for a jury to receive the evidence. But, at this stage, the Court simply wants to make it clear for the record, so as to avoid potential reversal on this ground: out of an abundance of caution, it has not considered this evidence, and will strike it from the record at this time. The Court points out that it also has not considered Mr. Andersen's prior criminal history in any way to reach its decision in this case.

For these reasons, the Court will grant Mr. Andersen's motion to strike, insofar as it grants his request to strike Exhibits C, D, E, and F.

3.    CROSS-MOTIONS FOR SUMMARY JUDGMENT

On to the substantive matter at hand: resolution of the parties' cross-motions for summary judgment.

3.1    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

3.2    Substantive Analysis

Before getting into the specifics of the substantive issues in this case, the Court first provides this summary of what is at issue. In fact, the remaining issues are very discrete. The parties seem to agree that H&H made calls to Mr. Andersen using an automated dialer with an artificial or pre-recorded voice. Those calls, in turn, violate the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), *unless* Mr. Andersen consented to them. *See* 47 U.S.C. § 227(b)(1)(A) (making it illegal "to make any call (other than a call…made with the prior express consent of the called party)."). So, one main issue in this case is whether Mr. Andersen consented to receive the calls from H&H. If not, then the calls were illegal and Mr. Andersen prevails. If so, then the calls did not violate the TCPA and H&H prevails—*unless*, legally, Mr. Andersen was allowed to revoke his consent and did so by stating as much

on his outgoing voicemail message. That revocation issue is the other main issue in the case.

There is one additional minor issue that the Court must address—Mr. Andersen's standing to pursue this action—and it does so first, because if Mr. Andersen lacks standing, then the Court lacks jurisdiction to hear this case. Thereafter, the Court will address the consent and revocation issues in turn.

### 3.2.1 Does Mr. Andersen Have Standing to Maintain this Suit?

Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Its basic elements are: (1) that the plaintiff alleges an injury-in-fact; (2) the injury is fairly traceable to the defendant's unlawful conduct; and (3) the injury is likely to be redressed by the relief the plaintiff seeks. *Lujan*, 504 U.S. at 560–61; *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (citing *Allen v. Wright*, 468 U.S. 737, 750 (1984)).

H&H focuses primarily on the first element of standing: injury-in-fact. It argues that Mr. Andersen lacks standing to proceed in this suit, because he does not have any injury-in-fact in this case. (Docket #49, 19). Specifically, H&H argues that Mr. Andersen stipulated to the fact that he did not suffer an injury-in-fact and further that his statutory damages are not enough, as a matter of law, to create an injury-in-fact.

An injury-in-fact requires "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560.

Mr. Andersen runs into a problem right off the bat: he seems to have stipulated away his standing to pursue this case. At Mr. Andersen's deposition, H&H counsel asked of Mr. Andersen's counsel: "We were just off

the record and we're going to do a stipulation to shorten this, hopefully, and that's that the plaintiff has not incurred any actual damages. And by that, it would mean like an injury, what the legal term would be is like an injury in fact." (Docket #47, Ex. 2, 75:23–76:3). Mr. Andersen's counsel then stated "That is a fair stipulation. The plaintiff agrees." So, in essence, Mr. Andersen has stipulated that he lacks one of the essential elements of standing.

What was Mr. Andersen's counsel thinking? Essentially, in stipulating to that fact, he stipulated that his client could not pursue this case. This is particularly perplexing, seeing as the Court believes that there is sufficient evidence of an injury-in-fact to support standing.

Given that conflict—between the stipulation and the evidence—the Court must dig a bit deeper before dismissing the case for lack of standing. The Court begins by pointing out that it cannot find any case law from the Seventh Circuit specifically holding that such a stipulation could or should be effective over the evidence (most likely because it is a rare lawyer who would stipulate on the record that his client did not suffer an injury-in-fact). To be sure, "litigants can't stipulate to the enlargement of federal jurisdiction," *United States v. Accra Pac, Inc.*, 173 F.3d 630, 633, but the Court wonders whether that principle is a two-way street: can litigants stipulate that standing (or some element thereof) *does not* exist? In *Castellano v. Wal-Mart Stores, Inc.*, the Seventh Circuit noted that "it was stipulated in the Final Pretrial Order that Robert Castellano did not have standing to assert a claim for breach of contract against Wal-Mart." 373 F.3d 817, 821. The Seventh Circuit did not seem to have any qualms with that stipulation, leading the Court to believe that it is permissible for parties to stipulate away the existence of standing.

Case 2:13-cv-00867-JPS   Filed 04/21/14   Page 14 of 22   Document 57

Thus, Mr. Andersen's stipulation, alone, is likely reason enough for the court to dismiss this case for lack of standing.

But, the Court hesitates to resolve the matter on that ground, for two reasons. First, the stipulation is somewhat vague. Before mentioning the term "injury in fact," H&H's counsel first discussed "actual damages" and "injury." (Docket #47, Ex. 2, 75:23–76:3). Seeing as the parties now argue over whether statutory damages, alone, are sufficient to establish an injury-in-fact, the Court wonders whether Mr. Andersen's counsel meant to stipulate only to the lesser fact that Mr. Andersen had not suffered any damages as a result of the calls, but still meant to assert that he has an injury-in-fact. That is certainly possible.

Second, the facts and law seem to establish that Mr. Andersen did suffer an injury-in-fact. To begin, aside from the issue of statutory damages, Mr. Andersen undoubtedly suffered higher phone bills and regular annoyances as a result of H&H's calls, both constituting injuries-in-fact. More importantly, the Court agrees with Mr. Andersen that the existence of statutory damages provisions should be sufficient to establish an injury-in-fact. (Docket #50, at 3). The Third Circuit has held that "[a] plaintiff need not demonstrate that he or she suffered actual monetary damages because 'the actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'" *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 763 (3d Cir. 2009) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982)). In other words, a statute creating a right to receive statutory damages is enough to create the existence of an injury-in-fact. Any other rule would mean that many statutory-damages seekers would not have standing, because statutory damages often can, and indeed do, stand in for the existence of actual damages.

For these reasons—the vagueness of the stipulation and the countervailing facts that would establish standing—and in spite of the Court's concerns with overstepping its Article III powers, the Court determines it best to treat Mr. Andersen as having standing in spite of his stipulation. Even so, the Court ultimately determines that Mr. Andersen's claims must be dismissed for other reasons; thus, the Court's standing determination makes little substantive difference, other than that the Court proceeds through the remainder of its substantive legal analysis.

### 3.2.2    Did Mr. Harris Consent to the Phone Calls?

As mentioned above, H&H cannot have violated the TCPA if Mr. Andersen consented to the calls made by H&H. *See* 47 U.S.C. § 227(b)(1)(A) (making it illegal "to make any call (other than a call…made with the prior express consent of the called party)."). But, the existence of consent is an affirmative defense, and therefore H&H bears the burden to prove it. *E.g. Kolinek v. Walgreen Co.*, No. 13-CV-4806, 2014 WL 518174, *2 (N.D. Ill. Feb. 10, 2014) (citing *Thrasher–Lyon v. Ill. Farmers Ins. Co.*, 861 F.Supp.2d 898, 905 (N.D. Ill. 2012); *D.G. v. Diversified Adjustment Serv., Inc.*, No. 11-CV-2062, 2011 WL 5506078, at *3 (N.D. Ill. Oct. 18, 2011); *Martin v. Bureau of Collection Recovery*, No. 10-CV-7725, 2011 WL 2311869, at *1 (N.D. Ill. June 13, 2011); *Grant v. Capital Mgmt. Servs., L.P.*, 449 Fed. App'x 598, 600 n.1 (9th Cir. 2011); *Pinkard v. Wal–Mart Stores, Inc.*, No. 3:12–CV–2902, 2012 WL 5511039, at *2 (N.D. Ala. Nov. 9, 2012); *In re Rules & Regs. Implementing Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (Jan. 4, 2008); *Jones v. Bock*, 549 U.S. 199, 215 (2007); *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 & n.1 (7th Cir. 2012); *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012); *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir.2005)).

H&H correctly points out that the FCC has issued a declaratory order that is precisely on point:

> Because we find that autodialed and prerecorded message calls to wireless numbers provided by the called party in connection with an existing debt are made with the "prior express consent" of the called party, we clarify that such calls are permissible. We conclude that the provision of a cell phone number to a creditor, e.g., as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt.
>
> …
>
> Calls placed by a third party collector on behalf of that creditor [to whom prior express consent was provided] are treated as if the creditor itself placed the call.

(Docket #49, at 13 (citing *In re Rules & Regs. Implementing Tel. Consumer Prot. Act of 1991*, FCC Declaratory Ruling No. 07-232, 23 FCC Rcd. 559 ¶¶ 9–10 (Jan. 4, 2008) (alterations from H&H's brief))). The FCC has said elsewhere that:

> [P]ersons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary. Hence, telemarketers will not violate our rules by calling a number which was provided as one at which the called party wishes to be reached.

*In re Rules & Regs. Implementing Tel. Consumer Prot. Act of 1991*, 7 FCC Rcd. 8752, 8769 ¶ 31 (Oct. 16, 1992).

Given those standards, the Court has no doubt that Mr. Harris consented to receive the phone calls in question. As discussed in the factual background section, above, the evidence establishes that WE Energies received Mr. Andersen's cell phone number from Mr. Andersen himself. Accordingly, under the FCC guidance and myriad cases, the Court must conclude that Mr. Andersen consented to be called on his cell phone number

by WE Energies. *See, e.g.*, *In re Rules & Regs. Implementing Tel. Consumer Prot. Act of 1991*, FCC Declaratory Ruling No. 07-232, 23 FCC Rcd. 559 ¶ 9; *In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559 (Dec. 28, 2007); *Soppet v. Enhanced Recovery Co. LLC*, 679 F.3d 637 (7th Cir. 2012); *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036 (9th Cir. 2012); *Saunders v. NCO Fin. Sys., Inc.*, 910 F. Supp. 2d 464, 467 (E.D.N.Y. 2012); *Moore v. Firstsource Advantage, LLC*, No. 07–CV–770, 2011 WL 4345703 (Sept. 15, 2011 W.D.N.Y.); *Starkey v. Firstsource Advantage, LLC*, No. 07–CV–662, 2010 WL 2541756 (Mar. 11, 2010 W.D.N.Y.). Moreover, because H&H was acting as a third party collector on WE Energies' behalf, H&H is treated as having Mr. Andersen's consent as if WE Energies had "itself placed the call." *In re Rules & Regs. Implementing Tel. Consumer Prot. Act of 1991*, FCC Declaratory Ruling No. 07-232, 23 FCC Rcd. 559 ¶ 10.

Mr. Andersen objects that he provided his cell phone number with respect to some *other* address (he does not specify which other address),[6] and that this defeats his consent. He argues that "there is far more than a scintilla of doubt regarding whether Plaintiff had one account or multiple accounts at multiple addresses." This matters, according to Mr. Andersen, because consent applies only insofar as he provided his cell phone number "during the transaction that resulted in the debt owed." (Docket #54, at 15–16 (citing *In re Rules & Regs. Implementing Tel. Consumer Prot. Act of 1991*, FCC Declaratory Ruling No. 07-232, 23 FCC Rcd. 559,565)). Mr. Andersen argues

---

[6]This is a perfect example of where Mr. Andersen's vague and self-serving testimony comes into play. He acknowledges only that he lived at the 505 Lake Street address beginning "sometime between 2005 and 2010" (Docket #54, at 13), and then uses that uncertainty to argue that his WE Energies account may have covered some other address or period of time when he provided his cell phone.

that this means that his consent cannot be imputed from one of his addresses to another (note that Mr. Andersen, himself, has done everything in his power to obfuscate where he lived at specific times), but the evidence submitted by WE Energies shows that WE Energies obtained Mr. Andersen's cell phone number during conversations about his account, which included service to the 505 Lake Street address. The Court is satisfied that the evidence establishes that WE Energies received Mr. Andersen's consent "during the transaction that result in the debt owed," in satisfaction of *In re Rules & Regs. Implementing Tel. Consumer Prot. Act of 1991*, FCC Declaratory Ruling No. 07-232, 23 FCC Rcd. 559,565.

Mr. Andersen tries to bolster his point by quoting the same FCC order's statement that "prior express consent provided to a particular creditor will not entitle that creditor (or third party collector) to call a consumer's wireless number on behalf of other creditors, including on behalf of affiliated entities." (Docket #54, at 16 (citing *In re Rules & Regs. Implementing Tel. Consumer Prot. Act of 1991*, FCC Declaratory Ruling No. 07-232, 23 FCC Rcd. 559, 565 n.38) (emphasis supplied in Mr. Andersen's brief)). How interesting that Mr. Andersen fails to emphasize the most important portion of that phrase, which notes that consent provided to one creditor will not entitle that creditor to call a consumer *on behalf of other creditors* or affiliated entities. To any reasonable person, that is simply not what is happening here, and the reference quoted above simply does not apply.

For all of these reasons, the Court determines that Mr. Andersen provided consent to H&H, and thus that H&H did not violate the TCPA by using an autodialer to call Mr. Andersen to collect the debt he owed to WE Energies.

### 3.2.2  Did Mr. Harris Withdraw that Consent?

Of course, that determination only holds if the Court determines that Mr. Andersen's outgoing voicemail message failed to revoke his consent.

This is a two-part question. First, there is a legal question of whether consent under the TCPA can *ever* be revoked. Second, *if* consent can be revoked, then the Court must determine whether Mr. Andersen's outgoing voicemail message was effective to do so.

As to the first question, there is some inconsistency among the authorities. H&H cites two district court cases holding that consent is irrevocable under the TCPA. (Docket #49, at 16 (citing *Saunders*, 910 F.Supp. 2d at 468-69 (E.D.N.Y. 2012); *Chavez v. The Advantage Group*, 2013 WL 4011006, *4 (D.Colo. Aug. 5, 2013))).  Mr. Andersen points out that the FCC and the Third and Eleventh Circuits have held that consent is revocable. (Docket #54, at 18–19 (citing *In re Rules & Regs. Implementing Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 15391, 15398 (Nov. 26, 2012); *Gager v. Dell Financial Services, LLC*, 727 F.3d 265 (3d Cir. 2013); *Osorio v. State Farm Bank, F.S.B.*, 2014 U.S. App. LEXIS 5709, 28-29 (11th Cir. Fla. Mar. 28, 2014))). Generally speaking, Mr. Andersen's authority is the more persuasive on the issue.

The Court need not finally resolve that issue, however, because even if consent is revocable, Mr. Andersen's voicemail is not enough to have done so, in this case. To begin, there is no authority to support the contention that an outgoing message is sufficient to revoke consent. The *Breslow v. Wells Fargo Bank, N.A.*, case, cited by Mr. Andersen, is inapposite because, while it does seem to impose a duty on automated callers to occasionally check the *identity* of the party it is calling, that duty has nothing to do with checking to see whether a caller has revoked consent. 857 F. Supp. 2d 1316, 1319–22 (S.D.

Fla. 2012). Moreover, Mr. Andersen's proposal that his outgoing messages should be sufficient to revoke consent would create a totally unworkable rule. It would create a trap for all debt collectors who use automatic dialers: in essence, it would allow individuals to consent to receive automated calls, but then expose the debt collectors to liability as soon as the individual put up an outgoing voicemail message revoking consent, regardless of whether the debt collector actually received the message. And, of course, the debt collector would be extremely unlikely to receive any notice of that revocation in the meantime, by virtue of the nature of their collection services, using automatic dialers. If Mr. Andersen were to have his way, the entire notion of consent under the TCPA seems like it would be undermined.[7]

Having determined that Mr. Andersen's outgoing message could not have revoked his consent, and there being no evidence of any other efforts on Mr. Andersen's behalf to revoke his consent, the Court determines that Mr. Andersen did not revoke his consent.

4.     CONCLUSION

For all of these reasons, the Court is obliged to determine that H&H's calls to Mr. Andersen *did not* violate the TCPA. Accordingly, the Court is obliged to grant H&H's motion for summary judgment, and likewise to deny Mr. Andersen's motion for summary judgment. It will also grant in part and deny in part Mr. Andersen's motion to strike, as more fully discussed above.

Accordingly,

---

[7]In fact, the best rule would be one requiring revocation of consent in writing, as put forth by Mr. Andersen as consistent with the FDCPA. (*See* Docket #49 (citing *Kenny v. Mercantile Adjustment Bureau, LLC*, 2013 WL 1855782 (W.D.N.Y. May 1, 2013))). That requirement would ensure that the debt collector actually received revocation.

IT IS ORDERED that Harris & Harris, Ltd.'s motion for summary judgment (Docket #50) be and the same is hereby GRANTED, and this matter be and the same is hereby DISMISSED with prejudice;

IT IS FURTHER ORDERED that Dean Andersen's motion for summary judgment (Docket #42) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that Dean Andersen's motion to strike (Docket #51) be and the same is hereby GRANTED in part and DENIED in part, as more fully discussed above.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 21st day of April, 2014.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge